13-35-03 Michael Stiso v. Intl Steel Group et al. Oral argument as follows, 15 minutes for the plaintiff, 15 minutes to be shared by the defendants. Mr. Margolius for the plaintiff appellant. Good morning, Your Honors. May it please the court, my name is Andrew Margolius. I represent Michael Stiso and similarly situated individuals. I'd like to reserve three minutes for rebuttal, please. You may. Thank you, Your Honor. Your Honor, the facts are generally undisputed in this case. The appellant worked for ISD, what is now ArcelorSteel, which provided long-term disability benefits for employees who became disabled. The employer gave employees a summary plan description of the LTD plan. They never received the plan themselves and they required employees to read and sign off on these SPDs in the handbook. It named the employer as a plan sponsor and administrator and met life as a claims administrator. Unfortunately and very unfortunately, Mr. Stiso had a very severe stroke in early 2006 and became permanently disabled. The summary plan language that is at center of this controversy here is as follows. The plan uses your pre-disability earnings, that is your monthly base wage from ISG, on the day before your disability starts to determine your income while you are disabled. The pre-disability earnings on which your LTD replacement income is based are indexed, that is increased annually by a percentage. After you have received LTD benefits of 12 months, your pre-disability earnings are increased by 7%. If you continue receiving LTD benefits, your pre-disability earnings for purposes of the plan are increased 7% annually on the anniversary of your previous increase. And the summary plan, again, the only thing that Mr. Stiso received, also has a clause, when added to your other sources of disability income. The monthly benefit the LTD plan pays you will equal 60% of your pre-disability earnings. Your pre-disability earnings are indexed on an annual basis. Well, Mr. Stiso, of course, read this to mean that his monthly benefits are based off of his pre-disability earnings, which are increased by 7% annually. And pre-disability earnings equals the last base wage prior to when the person became disabled. Counsel, reading those two sections, that's pages 6-7 and 6-8 of the SPD, I would lean strongly in your direction. But the plan itself, I guess it's hard to say what name it is. I think it's 00017, which is what sets out the monthly benefits, doesn't have any of that increased language. It just says 60% of the first 10,000 of your pre-disability earnings. And I don't see anything in the plan that has the same kind of implications of 6-7, 6-8. So as I generally understand it, there are two ways of winning under ERISA. One is to say you win under the plan itself, which I find it hard, unless you can point out some other language. The other is you can win because of confusion between the two. So are you claiming only under the second? Or is there anything else in the plan that would give you any comfort? To be honest, we're claiming primarily under the second. The SPD is pretty clear. But the plan that you referenced, Your Honor, doesn't really state what the defendants, what the appellees state. It states here that these pre-disability earnings are indexed to decrease. I don't buy that part of the argument. I am just looking at the language of page 17. There's nothing in page 17, which is the place you would look to get your benefits, that gives you any comfort. Because that other argument, we can get to that. The indexing doesn't work to reduce the benefits. It just works to explain how sometimes they can be reduced. In fact, it helps you over there. Let's talk about the confusion between the two. If you're claiming under that, which is section 503, then do you have to show reliance? Yes. Yes. To some extent. What Amara talks about when they get into those issues, and it really comes down to estoppel issues, although I think it also affects fiduciary claims as well, as Judge Stranch has written about in one of her opinions, the reliance can be actual harm. It's not the detrimental reliance as if they see something specifically and do something as a result of that. It's actual harm. What the Supreme Court said very clearly in the Amara case, it said actual harm may sometimes consist of detrimental reliance, but it might also come from the loss of a right protected by ERISA or its trust law antecedents. In the present case, it is not difficult to imagine how the failure to provide proper summary information in violation of the statute injured employees, even if they did not themselves act in reliance on summary documents, which they might not themselves have seen, for they may have thought fellow employees or informal workplace discussion would have let them know of, say, plan changes. What page are you quoting from? In Amara? I've got it in front of me. It is in my briefing. That entire quote is in my briefing. I'll ask you a question when you get through answering this question. Okay. Well, now I'm a little disturbed because I don't know the exact page size in Amara. I'll find it. I'll find it. But I know that that is quoted and I know the site's in there. Yes, Judge Merrick? Are you saying that the plan itself, as distinguished from the SPD, the summary, says nothing whatsoever about the 7% increase, and so there's nothing in the plan itself that would support the view that the SPD takes? Is that what you're saying? No, Your Honor. The plan is generally fairly vague, but there is a section of the plan that does mention the 7% increase. Judge Boggs brought up the issue as to, well, what the plan says is clearly not as specific as SPD. Well, but the plan itself says. The plan itself says. The definition of indexed predisability earnings is, it says, indexed predisability earnings means your predisability earnings increased by 7%. The first increase will take place on the date the 13th monthly benefit payment is payable. Subsequent increases will take place on each anniversary of the first increase. You must have been continually receiving monthly benefits under the plan. Yes, sir. And that's what the SPD says. No, that's the plan that you were reading. That's the plan, yes. Yes, sir. And that's what the SPD is saying the plan intends, right? In essence, that's what it's saying the plan intends, but the SPD is much more clear in talking about increases and the monthly benefit connecting it with this indexing. And of course, you know, the issue here, and I have the same plan provision, is the plan's never provided to the employees, but the SPD is. I understand, but you've got that Mueller case that, I don't know exactly what it means, but it's arguable that it means forget the SPD. I don't really understand how that's possible. I don't think that that case stands for that because of the statute, which requires SPDs to be provided to employees, and it requires them to be provided in a clear manner that's accurate and doesn't misinform employees of any of their rights or obligations. What exactly do you say about the argument that, on the other side, that this plan is in some way talking only about a decrease in monthly benefits? That's my understanding. They've got a two-fold argument that we can say what the plan means because we've got discretion to do that, and we say you're wrong about it. Secondly, they say, as I understand it, that the plan itself and the SPD are only talking about a decrease, and I don't understand that. I could say a lot about it, but bottom line, number one, what they're saying about the effect of misrepresentations in the SPD, but what they're saying about the plan and that it actually decreases rather than increases disability benefits, they get to that by extrapolation. They're never clear in stating to the employees or really in the plan itself that pre-disability earnings, like their arguments are now, are actually decreased in a return-to-work situation. They get to that by merging things. What's the language that we've been discussing is on page 29 of the plan document. Is there any other language in the plan document on which you rely? I think there's some in the plan document in which we rely. Yeah, because as discussed earlier, we know what's in the SPD, which mentions increased a lot of times. There's no question of that. But if you go to the plan document itself after Amara, what else are you relying on in the plan document? Just help me understand the basis of this claim, the ERISA basis of your claim. Is it a benefits A-1B claim? Is it an A-3 equitable claim? Is it both? Let's see if I can answer your question. Work your way through it. Too many questions. I'm sorry, but kind of work your way through it for me so I understand. Remind me, please, Judge Strangio, if I've forgotten any portion of your question. I'll try to remember. Let's go with the last portion of your question first, because it's what I remember best. We're claiming both portions of the statute, Your Honor, the A-1B and the A-3. The A-1B really gets towards benefits, and the A-3, we think, applies towards estoppel and also the fiduciary rights issues here. In terms of, if I remember correctly, the first portion of your question, I think that's the primary thing that we reference in terms of the plan itself. The plan, there's really three ways of looking at this case. Either the plan and the SPD are consistent in promising seven percent increases per year, or- And state your position? There's one of our positions, yes. And it's one of our positions, really, in light of the second way of looking at this. And the third way is really the most forceful one. But the second way of looking at this is the summary plan is pretty specific about promising seven percent annual increases, and that's what the walk-away that an employee, an ordinary reader, would get from that. And the plan itself is vague. It's somewhat obtuse. And then the third way of looking at this is that the plan and the summary plan descriptions are inconsistent. And that would be primarily the way I think the appellees look at this, that the plan says, well, pre-indexed, excuse me, indexed pre-discipline, pre-disability earnings actually decrease monthly benefits rather than increase monthly benefits. And we think that's in direct contrast to the SPD. But under those type of circumstances, we think that the AMARA principle should take hold. And the fact that there's a specific statute, a portion of ERISA, that said SPDs are intended to be provided to employees and because that's the only document they see, they'd better be written in an accurate manner that doesn't misrepresent any of the benefits. And is that then, is your primary claim then an equitable claim? Is it an estoppel claim? I think, yes, Your Honor, that is the primary claim because I think that's the most clear. What's the most clear thing here is the SPD, which certainly talks about increases, increases and ties up these pre-disability benefits to the time your wages were right before you became disabled. And then they say those wages are indexed. So that's very clear in my eye, Your Honor. So it's based on an inconsistency between the SPD and the plan, not a consistency. I'm just trying to understand the basis of your claim. Well, the basis of our claim is really all three, but that is the, I think, the most persuasive. You're not arguing, are you? You're not, could I ask on that exact point, you're not arguing that there is an inconsistency between the meaning of the SPD and the meaning of the plan here when the plan itself says indexed pre-disability earnings means your pre-disability earnings increase by 7 percent and then the rest of that language. I'm not arguing it. How is that? I'm not defending against it. Yeah, okay. That's really their argument is that the two are inconsistent, Judge. Judge Merritt's counsel isn't, and help me here, pages 28 and 29 define pre-disability earnings and define indexed pre-disability earnings. Judge Merritt is correct. It reads on 29 exactly what he says. But page 17, which defines the benefits, does not use indexed at all. It only uses the term pre-disability earnings. Yes, sir. So you have two defined terms. The one favorable to you is not used on page 17. Isn't that your problem to address in saying that they're consistent? That would be the problem, yes, in saying that they're consistent. But because one clause in the plan does show consistency and that clause does not necessarily show consistency, it's sort of vague in my mind. You don't have anything that ties indexed pre-disability earnings to benefits in the plan itself. In the SPD, you've got lots of good stuff. Yes, sir. That's right. All right. So thank you. I see my time's up. I'd like to address a few issues on rebuttal, but thank you. You'll have however much you reserve for rebuttal. Good morning. At the pleas of the court, James Griffith for the Metropolitan Life Insurance Company, which was the claims administrator under the Arcelor plan. Point of order. I am splitting my time with my co-defendant from Arcelor. He will be addressing the A3 issues. Principally, I will be addressing the plan issues under A1B. I'd like to start with a point that both you, Judge Merritt, and you, Judge Boggs, touched on is what is really the effect of indexing? How is it really used in the plan? I'd actually like to start with what's the purpose of the plan because that really drives our analysis here. It says in Administrative Record 2, your benefit plan has been designed with the goal of rehabilitation and return to work in mind. The plan offers financial incentives for returning to work while still receiving a benefit. So how does indexing really help in that circumstance? How does it fulfill that? But this guy never did go back to work, did he? That's correct, Your Honor, but indexing does come up in the disability plan. So parts of the plan that assume a return to work don't apply in this case. Well, let me show how indexing would help them because it does help on the disability determination, if I may. So you pointed out, Judge Boggs, that there is actually some benefit because it looks like indexing does go up, and let me expand on that. Well, let me respond to Judge Merritt's point. I understand. I do want you to respond, but I understand that it may decrease in some areas. It may have a benefit in another area, but that's not the question. The question is what would a reasonable reader of the documents provided understand the promises to that reasonable reader? And just because it decreases over here and increases over here begs the question of what was this reader told? Well, I'm... So I don't want to interrupt your answer, but I want you to address that without spending too much time on telling us the wonderful things it does, because I think that begs the question. Well, I appreciate that, Your Honor, and I don't know that reasonable expectations is really the right standard. The standard is arbitrary and capricious, right? No, the standard is what does the language say to an ordinary reader? Well, and I can agree with that to an extent because sometimes, but when you have plan definitions here, which is what we're talking about, it may not be what an ordinary person looks at. I mean, it's, we have to look at the way the plan... The only thing they got was the SPD. They never got the plan. That's not true. That's not true. When she wrote her letter to the claims administrator at MetLife, she cited both the plan and the summary plan. She had both at the time she made this claim. Absolutely, she did. What, a lawyer got it for her? No, she asked for it herself. She was unrepresented at the time, and she kept pressing, and she did a very good job. She did what a good, faithful spouse would do, and she asked for it, and she got it. So she had both. But you agree that SPD itself is pretty clear on its face as to what any reasonable reader would think, right? No, I don't agree with that at all. You don't agree with that. When we read it and parse it, what part of it do you say doesn't mean that? Well, let's talk about the specific paragraph that he's talking about, okay, which is on You have to look at the previous page. I mean, if you're reading through this as an ordinary person, right, you start in the beginning. Well, what's the first thing you're told? Well, at AR 189 6-6, you're told how the plan works, okay? So the benefit payable from the LTD plan assures that, combined with other benefits you may be eligible to receive as a result of your disability, you'll have income equal to 60% of your pre-disability earnings up to a maximum disability income of $6,000. Now, that's really the definition that you see on page AR 17 that you were referring to, Judge Boggs. And what I'll point out, what I'll point out, it does not say... SPD? In the SPD, it does not... Is that what you're reading from? That's what I'm reading from. Okay. Now, that does not use that definition, or it does not use the term indexed in the SPD when it's talking about what the benefit is. Now, read further down that same page. You'll come to what is highlighted as a key term, and this is the part that I was trying to Here's where you see pre-disability earnings and indexed pre-disability earnings. That's the first time that you see indexed. And then you get to the part on the next page where he's talking about, where the plaintiff is talking about, and that comes from the two definitions in the plan at AR 28 and AR 29. But the problem is that, number one, it doesn't act as though indexed disability earnings is a term of art. It doesn't have it in quotes. It doesn't refer to a definition. And then on 6-7, it doesn't use that same term, indexed disability earnings, as though it's a term of art. It says the disability, or the pre-disability earnings, are increased annually by a percentage. It uses the word indexed, but it doesn't act like it's a term of art. So that's why I guess several of us are so insistent that the average reader says the pre-disability earnings are increased annually by a percentage, on which your replacement income is based. Now, I agree with you that the technical term, indexed pre-disability earnings, is used to determine eligibility, and it's used to determine wage replacement in a favorable way, right? Because the more it increases, the more you can earn. But that's the technical term. And that's why, in my personal view, you're good on the plan, because the plan doesn't say anything about indexed in the benefit definition. But that's why you're bad, in my view, on the SPD, because that fourth paragraph tells, to me, any reasonable person, that your pre-disability earnings will be increased for the basis of your replacement income. How do you get around that? Well, easily. Let's start with what pre-disability earnings are, right? They're wages, right? So, according to this paragraph, what are we increasing? We're increasing wages. How much are we increasing it? Seven percent annually. For what purposes? For the purposes of the plan. Weary, though. You rest on that a lot. But that only appears in the third sentence. The question is, do you put a lot of oomph on that third sentence? Because the second sentence doesn't have it. The second sentence flatly says, after you've received benefits for 12 weeks, by seven percent, which means that when the third sentence adds, for purposes of the plan, that doesn't look to the average reader like, you know, something that, uh-oh, big red flag. The plan is about benefits. Now, again, I agree, when you go read the plan, you don't get any comfort. But when you read the SPD, to me, you don't get a red flag that says, no, this is all a bunch of nonsense. Well, Your Honor, again, I mean, for purposes of the plan, I mean, it directs the reader back to the plan. And she had the plan at the time. When you say she had the plan at the time, your statement, I thought, was she had the plan when she made the claim, as opposed to when the worker began working or was working or suffered the injury. Is that the distinction you're making? I couldn't give you the precise time, but I know for sure that she had it at the time that she made the claim. Yeah, but he'd already had the stroke by then. I would agree with that. All right, so if there is a question of reliance or harm or something, the fact that she had it later just means that they didn't hide the ball. But it doesn't mean they gave it to every worker. I see him out of time. Is that a fair statement? All right, any other questions? OK, so your adversary will, or not your adversary, your colleague will. But I take it this is primarily just a division of labor, the interests. There's no conflict of interest between the two of you. That's correct, Your Honor. And please, the Court, I, Ian Morrison, I represent ArcelorMittal. And as Mr. Griffith said, I'd like to focus on the equitable relief claims that were discussed at length in the briefs and below. We obviously agree with the interpretation of the plan and believe that there is no indexing of the benefit under this plan. But the focus of the claim appears to be on a theory of estoppel. And I wanted to answer for the Court a question. Both, isn't it? Didn't he just get through saying when he was asked that he was relying on both theories? He did. He did. And actually, I will circle back to that point because I think that may be important in one of our arguments. I just wanted to be clear in my mind that what he said you agree with. He's bringing both the claim under ERISA Section 502A1B for the benefits and a claim for estoppel. That was what was pleaded in the complaint. In the Amara decision, I believe it was Judge Boggs you asked this question of whether Amara talked about reliance. And Amara talks about a whole lot of things. But it says at 131 Supreme Court, 1881, that in the context of requirement, it says, accordingly, when a court exercises its authority under Section 502A3 to impose a remedy equivalent to estoppel, a showing of detrimental reliance must be made. And then it goes on and explains what that means, doesn't it? It explains for other remedies that the Court talks about in this section that there may not be a requirement of showing of detrimental reliance, that it may be, for example, if a claim that was being brought as a claim for surcharge or showing for harm is sufficient. The Court is clear, and subsequent decisions have been clear in interpreting and reading that language to say that for estoppel, detrimental reliance is required. If the plaintiff were bringing a different claim against the defendants, there might not be that requirement. But the only claim that was pleaded was one for estoppel. But what your opposing counsel quoted was an explanation. Yes, let's assume you do have detrimental reliance. But that begs the question of what constitutes detrimental reliance. And there's some discussion in Amara of that, is there not? There is not about what constitutes detrimental reliance. There is discussion about what constitutes harm following that, which is a requirement for proof of, for example, the Court specifically talks about surcharge as a remedy. It doesn't say that the more amorphous concept of harm is sufficient to prove detrimental reliance. In this Court's cases, if you look back at the cases of this Court where reliance has been an issue, this case is nothing like those. And the complaint alleges that Mr. Steso started working, I believe, in 2003, thereafter received the summary plan description, thereafter went out on disability. No act or event happened where he was looking at LTD benefits. He doesn't allege anything specific. There is simply a conclusion pleaded in the complaint of reliance. And under the Supreme Court's Twombly and Iqbal decision, simply pleading a conclusion isn't enough to even state a claim for estoppel. Counsel, are provisions like this in a lot of these ERISA plans, is this a standard sort of thing, or is this a one-time only for your client situation? And secondly, how many people in your company's situation are covered by the plan where this could end up being an issue in their cases as well? Two questions there. I don't know the answer to how common this type of language is in the industry. I will say that it has popped up in a few cases that have been cited by the parties. I would defer to counsel for MetLife, who could probably give you statistics on how often it, but it's not uncommon to have indexing used to increase the measure against... And to have an SPD that says this and so on? This SPD was written for our client, and so it's, I don't think this exact language shows up elsewhere. In fact, in the other cases, in the PSIC case... It's comparable to the classic language, isn't it? It is different than the PSIC language because that language specifically talks about the increased. Here, the SPD never makes that conclusion. And I think if you read it, as Mr. Griffith was sort of walking the court through, you read the language, it never says your benefit goes up 7%. It talks about the measure that is used to determine whether you remain eligible for disability. I thought it was talking about long-term disability, you're saying. Well, how many of your own We think that there are in total something on the order of 17 folks who are receiving benefits under this plan. The number of employees who would have gotten this same SPD is probably in the thousands, isn't it? It may not be because this was a company that was acquired by a company that was acquired by a company, and this didn't apply to everybody. It doesn't apply to all current employees. This is not currently the plan. And I take it you've probably changed the language and the plan now, right? I don't know the answer to that as to this particular benefit because this applies to sort of a closed set of individuals under the MetLife plan. Is PSIC the one that says 7% or the inflation rate, whichever is lower? I believe that's right. It sort of makes more sense than a 7% increase sounded conservative when we had 10% inflation, but it's pretty darn good when we've got 2% inflation. Isn't that kind of the problem here from your financial point of view? It is, and I think if we had a situation in which I disagreed with Mr. Griffith about this, I think the plaintiff's claim would be more probable. Here, the purchaser of the insurance and the sponsor of the plan and the insurer both agree that this does not provide for this benefit, and I think the plan document is clear about that. They both have an interest in coming out with that result so they pay less, right? Well, I think they have an interest in... You have to take into account, as Supreme Court has said, the interests of the administrators of the plan as well as the employer. Well, they have an interest in ensuring that the plan is applied as intended. The Amara case, as you were reading and as your adversary was reading, sounded to me as though it said, okay, if you're going under 503 and you're doing equitable estoppel, you need detrimental reliance, but then it says there may be other equitable remedies because those are the words of 503, and then it starts talking about certain things including like loss of rights under ERISA. Would not getting benefits that you reasonably thought you were entitled to be a loss of rights under ERISA? Well, I'll start with, as I said before, the complaint only pleads the claim for estoppel. I think that in this case, there's no argument that he reasonably expected these benefits because the SPD that the plaintiff is relying on repeatedly points back to the plan and as counsel indicated, Mrs. Stiso had the plan when she was making the very argument that's at issue here. So I think respectfully that that situation is not present. What kind of loss of right protected by ERISA then is the court talking about near the bottom of 1881, do you think? Well, in the Amara case is an example of what I think the court may have been talking about and there's a lot of argument about how much dicta that dicta is dicta. But the court was talking about a situation in which CIGNA had misrepresented the pension benefits. It said these benefits in this conversion that we're going through are much better than they really were, and the record by the time it got to the Supreme Court was that that had simply not been true. And I think that... Doesn't the SPD, at least in the interpretation some of us are giving it, misrepresent the plan? Again, in my view, the plan is completely on your side, but the SPD misrepresents it because of the language we've been talking about. Well, we respectfully disagree with that and I believe the plan is very... The SPD is very clear when it is talking about the indexing, the effect of the indexing is not on the benefit, but it's on the total amount... Okay, I understand that argument, but at least for the legal point of view, if you give me that that's a misrepresentation, then does that fit into the window that Amara seems to open or do you have some argument as to why even that doesn't get in? Well, I think there are a couple of arguments. One, the Sixth Circuit's cases, which the Supreme Court studiously did not disturb the underlying case law and these equitable remedies, require a knowing misrepresentation. There's been no evidence or allegation of that. The only evidence in the record is the plan and the SPD and the communications about the claim, which indicate that ArcelorMittal knew and believed that the plan did not provide indexing and there's a requirement of detrimental reliance to have any recovery and that has survived the Amara decision as explained by a number of lower court decisions as well. Is that in the context of the equitable estoppel? I'm sorry, is that what you're tying that to? Yes, yes. So, what Judge Boggs was asking you about was what other equitable remedies might be a separate equitable remedy that Amara has indicated might still exist? The answer, I guess, is in our view, no, for two reasons. One, and most importantly for this case, that's not been alleged. The allegation is estoppel. Secondly, the SPD here does not misrepresent the terms of the plan. It repeatedly points to the plan, advises people to look at the plan, says the plan controls, and it never says what it has been represented as saying. It never says the benefit increases by 7%, so we don't think you'd get there. Nor does it say what you say it indicates, that the benefit decreases only, correct? It says neither, correct? It doesn't say either of those, and it's not our position that the plan says the benefit decreases because of the 7%. I think that's a spin on our position as to what the 7% does that's not accurate. No, I thought your position was that the only thing the indexed predisability alteration impacts, other than the introductory language that's in the plan, is that it is used to decrease benefits because your goal is to bring people back to the workforce. So you decrease benefits in relationship to this indexed amount in order to draw them back into the workforce. Wasn't that the argument that your co-counsel made? There are work incentive provisions in this. They don't actually work to decrease the benefits in the way that has been suggested by the plaintiff here. What the plan would otherwise do without this indexed earnings provision is if somebody makes any money while disabled, it would simply offset that and shrink the benefits. This provision increases the comparison point. The indexed predisability earnings go up so that the shrinkage is not as much if they work to encourage them to work. It is used in a reduction section, but the indexing makes that reduction less than it would be otherwise. Thank you. All right. Thank you. Time's expired. How much time for rebuttal? Three minutes. Thank you. My fault. I didn't note that. If you said so. Thank you, Your Honors. I want to address a few points. And primarily, the first point I want to get into is what the appellee raised in the very beginning of their argument. What is the purposes of their plan? They're trying to twist around, I think, the purposes of this plan to make it meet some sort of return to work situation. And I really think that, and I think an average reader of the SPD would say the purposes of the plan is purely to provide an employee with replacement income if they can't work. Now, an ancillary purpose and an admirable purpose is to see if you can get that employee back to work. But it just doesn't fit in this situation. So for purposes of the plan, and this is where the district court erred, really to get into that and attach any significance to that somewhat innocuous phrase really is to provide replacement. Before that, it says it's a disability plan. Yes. That's what an overall description would be. And I think that's the walk away. You know, if you become disabled, you're going to get replacement income. Yes, Judge Mayer. And when you started talking about the overall purpose of the plan, by the time this was done in 05, 06, you know, we're running inflation at 2 or 3 percent. So why would a company promise to give you 7 percent increase forever, which may be 10, 20 years? I mean, in a practical way, I guess that's my concern. I think the language is good, but I think it was written in the SPD was written kind of stupidly to appear to promise something that would be no reason for the company to promise. Well, from their point of view, I think it was written stupidly because... I mean, Pycheck talks about 7 percent or cost of living, whichever is less. Yes, sir. That makes a certain amount of sense. 7 percent forever doesn't make any sense, does it? Perhaps because of the industry and the prevalence of unions and 7 percent, and perhaps it is historical. But it's interesting, too, that they talk about 7 percent being too high because of actually as a decrease to a return to work situation, and then that shrinkage is even bigger. So the 7 percent helps you that way, counsel. The bigger that is, the more you can earn without any reduction. To me, that's getting nowhere. But okay, go ahead. So let me, I want to circle back to the claims that you have in the complaint. So you have a benefits claim and you have an equitable estoppel claim and a fiduciary breach. Exactly, Your Honor. Three, am I correct? That's exactly correct, and we plead both portions of the statute, the A3 and the A1B, directly in the complaint. And what do you say in the complaint under 503? Do you use the terms equitable estoppel, and do you use any other terms? Because your adversaries seem to say, okay, even if we get there, they only plead equitable estoppel, and Amara is going to knock them out there. Do you have any other language you can point to in your 503 complaint? Well, Your Honor, the A3 complaint talks about equitable estoppel and fiduciary duties very specifically and goes through the typical estoppel. So writing a bad SPD would be a violation of their fiduciary duties, maybe? It would be a violation of their fiduciary duties, but we continually identify that they have these benefit rights, which I think is a core A1B claim. Didn't the district court deal with all of those things in its opinion? It dealt primarily with the estoppel claim, which we thought was what the district court wanted us to brief, and that was one of the big issues, but it dealt sort of in a peripheral sense with the A1B claim, Your Honor. And, you know, one of the remedies, too, it's clear that there's a very strong SPD language in at least my mind and in Mr. Sticeau and Ms. Sticeau's mind, but the bottom line is that there's a number of remedies beyond just simple estoppel. There's the fiduciary issue, and then there's also the ability to reform the contract itself to make it come into conformity with what the SPD tells employees. And so there's a number of ways we can get there, Your Honor, but the bottom line is there's a purpose to this clarity portion of the ERISA statute, and that purpose is to make sure that employees are properly informed of their rights and that they're accurately informed without any misrepresentations, and that simply did not occur here. Any other questions, judges? Thank you, counsel. All right, thank you, Your Honor. Case will be submitted. Thank you.